Case: 4:15-mj-07230-SPM   Doc. #:  8   Filed: 02/16/16   Page: 1 of 28 PageID #: 71
Case: 4:15-mj-07230-SPM   Doc. #:  6-2 *SEALED*   Filed: 02/12/16   Page: 1 of 28 PageID
#: 43
Case: 4:15-mj-07230-SPM   Doc. #:  1   Filed: 07/30/15   Page: 1 of 28 PageID #: 1

AO 106 (Rev. 06/09)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of Missouri

**FILED**

JUL 30 2015

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| 2006 white dual axle travel trailer, Illinois license plate 603859RT, VIN: 1NL1GTR2461041590, presently located at 174 Cabin River Road, Troy, Missouri, In the Eastern District of Missouri and all computers, computer hardware, computer and digital media, and wireless telephones therein. | ) ) ) ) ) ) ) | Case No.   4:15MJ7230 SPM |

## APPLICATION FOR A SEARCH WARRANT

I, Chris Bosley                          , a federal law enforcement officer or an attorney for the government request a search warrant and state under penalty of perjury that I have reason to believe that on the following property:

2006 white dual axle travel trailer, Illinois license plate 603859RT, VIN: 1NL1GTR2461041590, presently located at 174 Cabin River Road, Troy, Missouri, In the Eastern District of Missouri and all computers, computer hardware, computer and digital media, and wireless telephones therein.

located in the       EASTERN       District of       MISSOURI       , there is now concealed

### SEE ATTACHMENT A

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18:2251 | |
| 18:2252 | Production, Receipt, Possession, and Transportation of a Minor in Interstate Commerce |
| 18:2252A & 18:2423(a) | |

The application is based on these facts:

### SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.

☐ Delayed notice of       days (give exact ending date if more than 30 days:                     ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Special Federal Officer Chris Bosley
Federal Bureau of Investigation

*Printed name and title*

Sworn to before me and signed in my presence.

Date:       July 30, 2015

*Judge's signature*

City and state:       St. Louis, MO

Honorable Shirley Padmore Mensah, U.S. Magistrate Judge

*Printed name and title*

AUSA:  ROBERT F. LIVERGOOD, 35432MO



IN RE SEARCH OF THE PREMISES LOCATED AT:

2006 white dual axle travel trailer, Illinois license plate 603859RT, VIN: 1NL1GTR2461041590, presently located at 174 Cabin River Road, Troy, Missouri, In the Eastern District of Missouri

and all computers, computer hardware, computer and digital media, and wireless telephones wherein..

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Chris Bosley, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises of a 2006 white dual axle travel trailer, Illinois license plate 603859RT, VIN: 1NL1GTR2461041590, presently located at 174 Cabin River Road, Troy, Missouri, which is in the Eastern District of Missouri, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.

2. I am a Special Federal Officer (SFO) with the Federal Bureau of Investigation's ("FBI") Child Exploitation Task Force. I have been a Special Federal Officer for almost six years and have been a sworn Deputy with the Lincoln County Sheriff's Office for over 17 years. I am also assigned as an investigator to the Missouri Internet Crimes Against Children Task Force and the Secret Service's Gateway Electronic Crimes Task Force. I have conducted numerous investigations regarding the sexual exploitation of children that involve the use of a computer which has been used to commit a crime in violation of Title 18, United States Code, Sections 2251, 2252, 2252A, and 2423(a). As a Task Force Officer, I am authorized to investigate violations of laws of the United States and to execute warrants issued under the authority of the United States. I have been personally involved in the execution of search warrants to search residences and seize material relating to the sexual exploitation of minors including computers, computer equipment, software, and electronically stored information. I have experience utilizing computers during my career as an investigator and I have completed multiple in-service training, outside training, and other courses in computer crime investigation.

3. This affidavit is made in support of an application for a search warrant to search

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 3 of 28 PageID #: 73
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 3 of 28 PageID
Case: 4:15-mj-07230-SPM   Doc. #: 1   Filed: 07/30/15   Page: 3 of 28 PageID #: 3

for and seize instrumentalities, fruits, and evidence of violations of Title 18, United States Code, Sections 2522(b), 2252 and 2252A, 2423(a), which criminalize, among other things, the attempted enticement of a child, the possession and/or receipt and shipment of child pornography, and other related materials; and the transportation of a minor with the intent to engage in criminal sexual activity. The items that are the subject of the search and seizure applied for in this affidavit are more specifically described in Attachment B.

4.      The premise to be searched is described in Attachment A and is a 2006 white dual axle travel trailer, Illinois license plate 603859RT, VIN: 1NL1GTR2461041590, presently located at 174 Cabin River Road, Troy, Missouri, which is in the Eastern District of Missouri.

5.      The statements contained in this affidavit are based on my personal knowledge or information provided to me by other law enforcement officers, including Special Agent Robert Krivanek, of the FBI. Since this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of the violation of Title 18, United States Code, Sections 2422(b), 2252, 2252A, and 2423(a) including, but not limited to, the items described in Attachment B, which is attached hereto and incorporated by reference, will be found within the premises to be searched.

## I.      DEFINITIONS

6.      The following terms have the indicated meaning in this affidavit:

a.      The term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such a device, but such term does not include an automated typewriter or typesetter, a portable hand held calculator, or other similar device. 18 USC § 1030(e).

b.      The term "minor" means any individual under the age of 18 years. 18 USC § 2256(1).

c.      Sexually explicit conduct means actual or simulated sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or lascivious exhibition of the genitals or pubic area of any person. 18 USC § 2256(2)(A).

d.      Visual depiction includes undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual

2

Case: 4:15-mj-07230-SPM   Doc. #:  8   Filed: 02/16/16   Page: 4 of 28 PageID #: 74
Case: 4:15-mj-07230-SPM   Doc. #:  6-2 *SEALED*   Filed: 02/12/16   Page: 4 of 28 PageID
Case: 4:15-mj-07230-SPM   Doc. #:  1   Filed: 07/30/15   Page: 4 of 28 PageID #: 4

image.  18 USC § 2256(5).

e.   Child pornography means any visual depiction, including any photograph, film, video, picture, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct or such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct.  18 USC § 2256(8)(A) or (C).

f.   Identifiable minor means a person who was a minor at the time the visual depiction was created, adapted, or modified; or whose image as a minor was used in creating, adapting, or modifying the visual depiction; and who is recognizable as an actual person by the person's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature; and shall not be construed to require proof of the actual identity of the identifiable minor. 18 USC § 2256(9).

g.   "Computer hardware," as used herein, consists of all equipment which can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data, including for example, tablets, digital music devices, portable electronic game systems, electronic game counsels and wireless telephones.  Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

h.   "Computer software," as used herein, is digital information which can be interpreted by a computer and any of its related components to direct the way they work.  Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

i.   "Computer-related documentation," as used herein, consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, computer software, or other related items.

j.   The phrase "records, documents, and materials" as used herein, including those

3

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 5 of 28 PageID #: 75
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 5 of 28 PageID
Case: 4:15-mj-07230-SPM   Doc. #: 1   Filed: 07/30/15   Page: 5 of 28 PageID #: 5

used to facilitate communications, includes all of the listed items of evidence in whatever form and by whatever means such records, documents, or materials may have been created or stored.  Those forms and means of storage and creation include but are not limited to any handmade from (such as writing or marking with any implement on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negative, videotapes, motion pictures, photocopies); or any information on an electronic or magnetic storage device (such as floppy diskettes, hard disks, and CD-ROMS), as well as printouts or readouts from any magnetic storage device.

k.   "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data.  Data security devices may consist of hardware, software, or other programming code.  A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices.  Data security hardware may include encryption devices, chips, and circuit boards.  Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched.  Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

l.   The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (including, but not limited to, tape recordings, cassettes, compact discs, electronic or magnetic storage devices such as floppy diskettes, hard disks, CD-ROMs, digital video disks (DVDs), Personal Digital Assistants (PDAs), Multi Media Cards (MMCs), memory sticks, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, or electronic notebooks, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device, wireless telephones, or any other electronic mobile device).

m.   Electronic data may be more fully described as any information stored in the form of electronic, magnetic, optical, or other coding on computer media or on media capable of being read by a computer or computer-related equipment.

n.   "Wireless telephone or mobile telephone, or cellular telephone'" as used herein means is a handheld wireless device used for voice and data communication

4

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 6 of 28 PageID #: 76
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 6 of 28 PageID
Case: 4:15-mj-07230-SPM   Doc. #: 1   Filed: 07/30/15   Page: 6 of 28 PageID #: 6

through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. A wireless telephone may have wireless connection capabilities such as Wi-Fi and Bluetooth. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

## II.     COMPUTERS AND CHILD PORNOGRAPHY

7.     I have participated in investigations of persons suspected of violating federal child pornography laws, including Title 18, United States Code, Sections 2251, 2252, 2252A, and 2422(b). I have also participated in various mandated and volunteer training for the investigation and enforcement of federal child pornography laws in which computers are used as the means for receiving, transmitting, and storing child pornography.

8.     Computers, computer hardware, wireless telephones, and computer technology have revolutionized the way in which individuals interested in child pornography interact with each other. Child pornography was formerly produced using cameras and film (either still photography or movies). The photographs required darkroom facilities and a significant amount of skill in order to develop and reproduce the images. There were definable costs involved with the production of pornographic images. To distribute these images on any scale required significant resources. The photographs themselves were somewhat bulky and required secure storage to prevent their exposure to the public. The distribution of such items was most often accomplished through a combination of personal contacts, mailings, and telephone calls.

9.     The development of computers, wireless telephones and computer hardware have changed the way in which individuals interested in child pornography interact with each other, as computers and computer hardware serve four basic functions in connection with child pornography: production, communication, distribution, and storage.

10.     Child pornographers can now transfer photographs from a camera onto a computer-readable format with a device known as a scanner. Digital cameras and wireless telephones allow images to be transferred directly onto a computer. A device known as a modem permits computers to connect to other computers through the use of telephone, cable, or wireless connection. Electronic contact can be made to literally millions of computers and

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 7 of 28 PageID #: 77
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 7 of 28 PageID
Case: 4:15-mj-07230-SPM   Doc. #: 1   Filed: 07/30/15   Page: 7 of 28 PageID #: 7

wireless telephones around the world.

11.     The ability of computers, computer hardware and wireless telephones to store images in digital form makes them ideal repositories for child pornography. The size of the electronic storage media (commonly referred to as the hard drive) has grown tremendously within the last several years. These drives can store hundreds of thousands of images at a very high resolution.

12.     The Internet affords collectors of child pornography several different venues for obtaining, viewing and trading child pornography in a relatively secure and anonymous fashion.

13.     Collectors and distributors of child pornography also utilize online resources to retrieve and store child pornography, including services offered by Internet Portals such as Yahoo! and Hotmail, among others. The online services allow a user to set up an account with a remote computing service that provides e-mail services as well as electronic storage of computer files in a variety of formats. A user can set up an online storage account from any computer with access to the Internet. Evidence of such online storage of child pornography is often found on the user's computer.

14.     As is the case with most digital technology, communications by way of computer, computer hardware and wireless telephones can be saved or stored on the devices. Storing this information can be intentional, i.e., by saving an e-mail as a file or saving the location of one's favorite websites in, for example, "bookmarked" files. Digital information can also be retained unintentionally, e.g., traces of the path of an electronic communication may be automatically stored in many places (e.g., temporary files or Internet Service Provider client software, among others). In addition to electronic communications, Internet users generally leave traces or "footprints" in the web cache and history files of the browser used. A forensic examiner can often recover evidence which shows that a computer contains specific software, when the software was installed, logs regarding the usage of the software, and even some of the files which were uploaded or downloaded using the software. Such information may be maintained indefinitely until overwritten by other data.

15.     A growing phenomenon on the Internet is peer to peer file-sharing (hereinafter referred to as "P2P"). P2P file sharing is a method of communication available to Internet users through the use of special software. The software is designed to allow users to trade digital files through a worldwide network that is formed by linking computers. There are several different software applications that can be used to access these networks, but these applications operate in essentially the same manner.

16.     To access the P2P networks, a user first obtains the P2P software, which can be downloaded from the Internet. This software is used exclusively for the purpose of sharing digital files. Once the P2P software is installed on a computer, the user is directed to specify a "shared" folder. All files placed in that user's designated "shared" folder are available to anyone

Case: 4:15-mj-07230-SPM   Doc. #:  8   Filed: 02/16/16   Page: 8 of 28 PageID #: 78
Case: 4:15-mj-07230-SPM   Doc. #:  6-2 *SEALED*   Filed: 02/12/16   Page: 8 of 28 PageID
Case: 4:15-mj-07230-SPM   Doc. #:  1 #Filed: 07/30/15   Page: 8 of 28 PageID #: 8

on the world wide network for download. Most P2P software gives each user a rating based on the number of files he/she is contributing to the network. This rating affects the user's ability to download files. The more files a user is sharing, the greater his/her ability is to download files. This rating system is intended to encourage users to "share" their files, thus propagating the P2P network. A user, however, is not required to share files in order to utilize the P2P network.

17.     A user obtains files by conducting keyword searches of the P2P network. When a user initially logs onto the P2P network, a list of the files that the user is sharing is transmitted to the network. The P2P software then matches files in these file lists to keyword search requests from other users. A user seeking to download files simply conducts a keyword search. The results of the keyword search are displayed and the user then selects the file(s) which he/she would like to download. The download of a file is achieved through a direct connection between the computer requesting the file and the computer(s) hosting the file. Once a file has been downloaded, it is stored in an area previously designated by the user and will remain there until moved or deleted. The majority of the P2P software applications retain logs of each download event.

18.     A person interested in sharing child pornography with others via a P2P network, needs only to place those files in his/her "shared" folder(s). Those files are then available to all users of the P2P network for download, regardless of their physical location.

19.     A person interested in obtaining child pornography can open the P2P application on his/her computer and conduct a keyword search for files using a search term, such as "preteen sex." The keyword search would return results of files being shared on the P2P network that match the term "preteen sex." The user can then select a file(s) from the search results and the selected file(s) can be downloaded directly from the computer(s) sharing the file(s).

20.     The computers that are linked together to form the P2P network are located throughout the world. Therefore, the P2P network operates in interstate and foreign commerce.

21.     One of the advantages of P2P file sharing is that multiple files may be downloaded in parallel (i.e. the user can download more than one file at a time). In addition, a user may download parts of one file from more than one source computer at a time. For example, a user downloading an image file may actually receive parts of the image from multiple computers. The advantage of this process is that it reduces the time it takes to obtain a file(s). A P2P file transfer is assisted by reference to an Internet Protocol (IP) address. An IP address is expressed as four numbers separated by decimals. Each number, which can range from 0 to 256, is unique to a particular internet connection during an online session. The IP address provides a unique location making it possible for data to be transferred between computers.

22.     Even though the P2P network links together computers all over the world and users can download files, it is not possible for one user to send or upload a file to another user of the P2P network. The software is designed only to allow files to be downloaded that have been

7

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 9 of 28 PageID #: 79
Case: 4:15-mj-07230-SPM   Doc. #:  6-2 *SEALED*   Filed: 02/12/16   Page: 9 of 28 PageID
Case: 4:15-mj-07230-SPM   Doc. #: 1   Filed: 07/30/15   Page: 9 of 28 PageID #: 9

selected.  One does not have the ability to send files from his/her computer to another user's computer without their permission or knowledge.  Therefore, it is not possible for one user to send or upload child pornography files to another user's computer without his/her active participation.

## III.        SPECIFICS OF SEARCH AND SEIZURE OF COMPUTER SYSTEMS

23.     Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components, or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment. This is almost always true because of the following:

a.     Computer storage devices (like hard disks, diskettes, tapes, laser disks, magneto opticals, and others) can store the equivalent of thousands of pages of information. Especially when the user wants to conceal criminal evidence, he/she often stores it in random order and with deceptive file names.  The latter requires searching authorities to examine all the stored data to determine whether it is included in the warrant.  This sorting process can take days or weeks, depending on the volume of data stored, and it would be generally impossible to accomplish this kind of data search on site.

b.     Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  Moreover, the vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  As such, it is difficult to know prior to a search which expert should analyze the system and its data. The search of a computer system is an exacting scientific procedure which is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files.  Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal activities of an operating system), the controlled environment of a laboratory is essential to its complete and accurate analysis.

## IV.        CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

24.     Most individuals who collect child pornography are sexually attracted to children, as their sexual arousal patterns and erotic imagery focus, in part or in whole, on children.  The collection may be exclusively dedicated to children of a particular age/gender or it may be more diverse, representing a variety of sexual preferences involving children.  Collectors of child pornography express their attraction to children through the collection of sexually explicit materials involving children, as well as other seemingly innocuous material related to children.

8

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 10 of 28 PageID #: 80
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 10 of 28
Case: 4:15-mj-07230-SPM   Doc. #: 1   Filed: 07/30/15   Page: 10 of 28 PageID #: 10

25.     The above-described individuals may derive sexual gratification from actual physical contact with children, as well as from fantasy involving the use of pictures or other visual depictions of children or from literature describing sexual contact with children. The overriding motivation for the collection of child pornography may be to define, fuel, and validate the collector's most cherished sexual fantasies involving children.

26.     Visual depictions may range from fully clothed depictions of children engaged in non-sexual activity to nude or partially nude depictions of children engaged in explicit sexual activity. In addition to child pornography, these individuals are also highly likely to collect other paraphernalia related to their sexual interest in children. This other material is sometimes referred to as "child erotica," further defined as any material relating to children that serves a sexual purpose for a given individual. "Child erotica" is broader and more encompassing than child pornography, though at the same time the possession of such corroborative material, depending on the context in which it is found, may be behaviorally consistent with the offender's orientation toward children and indicative of his/her intent. "Child Erotica" includes things such as fantasy writings, letters, diaries, books, sexual aids, souvenirs, toys, costumes, drawings, cartoons and non-sexually explicit visual images.

27.     Child pornography collectors may reinforce their fantasies by taking progressive, overt steps aimed at turning such fantasy(ies) into reality in some, or all, of the following ways: collecting and organizing their child-related material; masturbating while viewing child pornography; engaging children, online and elsewhere, in conversations, sometimes sexually explicit conversations, to fuel and fortify the fantasy; interacting, both directly and indirectly, with other like-minded adults through membership in organizations catering to their sexual preference for children, thereby providing a sense of acceptance and validation within a community; gravitating to employment, activities and/or relationships which provide access or proximity to children; and frequently persisting in the criminal conduct even when they have reason to believe the conduct has come to the attention of law enforcement. These are need driven behaviors to which the offender is willing to devote considerable time, money, and energy in spite of risks and contrary to self-interest.

28.     Child pornography collectors almost always maintain and possess their material(s) in the privacy and security of their homes or some other secure location, such as their vehicle(s), where it is readily available. The collection may include sexually explicit or suggestive materials involving children, such as photographs, magazines, narratives, motion pictures, video tapes, books, slides, drawings, computer images or other visual media. The collector is often aroused while viewing the collection and, acting on that arousal, he/she often masturbates, thereby fueling and reinforcing his/her attraction to children.

29.     Due to the fact that the collection reveals the otherwise private sexual desires and intent of the collector and represents his most cherished sexual fantasies, some collectors rarely dispose of the collection. The collection may be culled and refined over time, but the size of the collection tends to increase. Individuals who use a collection in the seduction of children or to

9

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 11 of 28 PageID #: 81
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 11 of 28
Case: 4:15-mj-07230-SPM   Doc. #: Page ID #07/30/15   Page: 11 of 28 PageID #: 11

document the seduction of children treat the materials as prized possessions and are especially unlikely to part with them. Even if a child pornography collector deletes files from his hard drive or other electronic media, a computer expert is often able to retrieve those files using computer forensic tools.

## V.      SEARCH METHODOLOGY TO BE EMPLOYED

30.      The search procedure of electronic data contained in computer, wireless telephones, computer hardware, computer software, and/or memory storage devices may include the following techniques (NOTE: The following is a non-exclusive list, as other search procedures may be employed):

a.      Examination of all of the data contained in such computers, computer hardware, wireless telephones, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as listed in Attachment A;

b.      Searching for and attempting to recover any deleted, hidden, and/or encrypted data to determine whether that data falls within the list of items to be seized as listed in Attachment A (any data that is encrypted and/or unreadable will be returned when law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

c.      Surveying various file directories and the individual files they contain;

d.      Opening files in order to determine their contents;

e.      Scanning storage areas;

f.      Performing keyword searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment A; and/or

g.      Performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment A.

## VI.      DETAILS OF INVESTIGATION

31.      On June 8, 2015, S.A. Krivanek received a telephone call from Sergeant (Sgt.) David Greenwood of the Pike County Sheriff's Department (PCSD). Sgt. Greenwood explained

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 12 of 28 PageID #: 82
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 12 of 28
Case: 4:15-mj-07230-SPM   Doc. #: Filed 05/30/15   Page: 12 of 28 PageID #: 12

that on June 6, 2015, Sgt. John Pennock, also of PCSD, received a telephone call from a ███████ of Daly City, California informing Sgt. Pennock that ███████ 15-year-old niece, (L.H.), may have been abducted from her home in Conway, South Carolina by a 46-year-old man, Ralph David Hathaway (Hathaway). ███████ further indicated there was an incident about one year ago when Hathaway asked L.H.'s father, ███████ if he could marry L.H. ███████ indicated he had learned of L.H.'s disappearance after speaking with his mother.

32.   On June 6, 2015, at 8:29 p.m., members of the PCSD went to the residence Hathaway's family, located at 260 South Mississippi Street, New Canton, Pike County, Illinois 62356, and discovered that L.H. was there with Hathaway. Sgt. Greenwood arrested Hathaway and placed L.H. in protective custody. During processing, it was discovered that Hathaway's date of birth is October 27, 1968, and L.H.'s date of birth is September 9, 1999.

33.   Sgt. Greenwood interviewed Hathaway on June 6, 2015. In the interview, Hathaway indicated that L.H. was in love with him. Hathaway admitted that he had driven to Conway, South Carolina, picked up L.H. down the road from her home, and drove her back to Illinois. He stated that he did this based on communication he had with L.H. a couple days prior. Hathaway further stated that he had met L.H. on a pier in South Carolina. He stated that he initially believed that she was 18-years-old, but he later found out her real age. He stated that he had previously asked L.H.'s father permission to marry L.H. He stated that the only physical contact between L.H. and him was a kiss on the cheek, and that he treats L.H. the same way he treats his daughter, giving her hugs and kisses.

34.   Sgt. Greenwood also interviewed L.H. on June 6, 2015. L.H. stated that she and Hathaway were in love, and that he would "die for [her] in a heartbeat." She stated that before going to Illinois, she and Hathaway stopped in Troy, Missouri, where she unpacked her luggage in Hathaway's camper. She stated that she had initially told Hathaway she was 18-years-old, but a year prior he proposed to her, at which point she told him her real age. L.H. further stated that she and Hathaway communicated through their cellular phones, and that on their way back from South Carolina, she threw her cellular phone in a dumpster at a gas station. She stated that the only physical contact they had with one another was some kissing and holding hands.

35.   On June 7, 2015, at 3:50 a.m. Sgt. Greenwood escorted L.H. to the St. Louis, Lambert Airport where she boarded United Airlines flight 4975 to San Francisco, California to stay with ███████. L.H.'s father ███████ provided his consent to allow ███████ to take custody of his daughter.

36.   Prior to arriving at the airport, Sgt. Greenwood met Hathaway's daughter, ███████ who brought some clothing and personal items from Hathaway's camper that L.H. had requested. After receiving these items, L.H. voluntarily turned over to Sgt. Greenwood one "Nextbook" tablet, one "Eclipse" MP3 player, and one small blue MP3 player. L.H. had provided Sgt. Greenwood with a list of items, one of them being an iPod in a green turtle case. Upon receipt of the clothing and personal items, Sgt. Greenwood noted that only the green turtle case for the iPod was in L.H.'s belongings.

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 13 of 28 PageID #: 83
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 13 of 28
Case: 4:15-mj-07230-SPM   Doc. #: Page ID #05/30/15   Page: 13 of 28 PageID #: 13

37.     On June 10, 2015, S.A. Krivanek contacted ███████ and conducted a telephone interview. ███████ informed me that he was the brother of L.H.'s deceased mother. ███████ indicated that, since arriving three days prior, L.H. disclosed to ███████ that she and Hathaway had sexual intercourse in Hathaway's camper in Troy, Missouri and she was concerned that she may be pregnant. L.H. also told ███████ that she and Hathaway had sexual intercourse numerous times over the course of their relationship. L.H. kept a journal of their relationship in a notebook which she left inside a barbecue grill outside of Hathaway's camper.

38.     Sgt. Greenwood was informed of the journal that L.H. left at Hathaway's camper. He went to the camper, located at 174 Cabin River Road, Troy, Missouri on June 10, 2015. Hathaway provided Sgt. Greenwood consent to search the camper but Sgt. Greenwood was unable to locate the journal. Hathaway provided Sgt. Greenwood the remainder of L.H.'s belongings so they could be returned to L.H.

39.     On June 10, 2015, ███████ took L.H. to The Keller Center in San Mateo, California for a forensic medical exam and a forensic interview. During the forensic interview, L.H. disclosed the following regarding the history of her relationship with Hathaway:

a.  In 2013, L.H. had an online relationship with Hathaway's nephew, ███████ ███████. The relationship was sexual in nature, and it included undressing and masturbating together over Skype.[1] ███████ was 20-years-old and knew L.H.'s age to be 13-years-old.

b.  ███████ captured nude pictures of L.H. without her consent and saved them on his laptop computer. ███████ started having issues with his laptop and gave it to his uncle, Hathaway, to diagnose and fix. Hathaway discovered the nude photographs of L.H. and reached out to her on her social media accounts, including but not limited to Skype, Facebook, Rocketmail and Yahoo email, and text messaging. Hathaway and L.H. began an online relationship which was also sexual in nature, and included masturbating via Skype. On at least one occasion, Hathaway performed intercourse with his own wife, and allowed L.H. to view those acts through Skype. At the outset of their online relationship, L.H. led Hathaway to believe she was 18-years-old.

---

[1] Skype is a telecommunications application software product that allows users to communicate through video chat and voice calls from computers, tablets, and mobile devices via the Internet to other computers, tablets, and mobile devices. Users can also send instant text messages, exchange files and images, send video messages, and create conference calls. By default, the Skype application on a device logs instant text message chat history. The video and audio of communication between users are not saved through the application, but may be recorded using a variety of other software applications.

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 14 of 28 PageID #: 84
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 14 of 28
Case: 4:15-mj-07230-SPM   Doc. #: Page16d#08030/15   Page: 14 of 28 PageID #: 14

c.  In June of 2013, Hathaway drove from New Canton, Illinois to Conway, South Carolina to meet L.H. in person. L.H.'s father was not home and L.H. and Hathaway had oral sex, anal sex, and masturbated in front of each other in L.H.'s home. L.H. stated that Hathaway was "teaching [her]" various sexual acts. The following day, Hathaway rented a hotel room and L.H. and Hathaway spent the night there. They played "truth or dare," and ultimately had protected vaginal intercourse. This was L.H.'s first time having vaginal intercourse with anybody. Hathaway took pictures of them having intercourse and told L.H. he would send them to his wife, ▮▮▮▮ Hathaway. who was aware of his relationship with L.H.

d.  In August of 2013, Hathaway asked L.H. through online communication to marry him. Hathaway then drove to Conway, South Carolina to ask L.H. to marry him in person. Hathaway stayed in a camper within walking distance of L.H.'s home. L.H. disclosed to Hathaway at that time that she was not 18–years-old, but in fact, 13-years-old. Hathaway continued to engage in a physical relationship with L.H.; they had vaginal intercourse seven times and oral sex multiple times during that August 2013 visit.

e.  In October of 2013, Hathaway again drove from New Canton, Illinois to Conway, South Carolina to see L.H., and he stayed in a hotel near L.H.'s home. Hathaway had vaginal intercourse with L.H. multiple times during this visit, and Hathaway did not use a condom. This trip was planned beforehand through online communication. Hathaway and L.H. discussed having sex during the planning.

f.  In April of 2014, Hathaway again drove from New Canton, Illinois to Conway, South Carolina and stayed in the same hotel not far from L.H.'s home. He stayed for five days or less. L.H. would go to school during the days and meet Hathaway after school. Hathaway knew L.H.'s true age and grade in school because they discussed it openly. Hathaway and L.H. also discussed having a baby together, and during this visit, Hathaway had unprotected vaginal intercourse three to six times with L.H. in an effort to impregnate her. L.H. missed her next period, but the following month, L.H. had a very heavy period, leading L.H. to believe she had a miscarriage. She was unable to confirm this. Following her heavy period, she started to experience burning, itching, and a steady discharge from her vaginal area. L.H. saw her pediatrician about this and was prescribed antibiotics.

g.  On July 3, 2014, Hathaway contacted L.H.'s father ▮▮▮▮ who agreed to speak to Hathaway. Hathaway planned to ask ▮▮▮▮ for his permission to marry L.H. When Hathaway arrived at L.H.'s home in South Carolina, ▮▮▮▮ told him to get back in

13

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 15 of 28 PageID #: 85
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 15 of 28
Case: 4:15-mj-07230-SPM   Doc. #: PageID #07/30/15   Page: 15 of 28 PageID #: 15

his car and leave. As Hathaway drove away ███ called the Horry County Police Department. The subsequent police investigation did not lead to any arrests.[2]

h. Hathaway and L.H. did not speak to each other after the July 3, 2014 incident until around L.H.'s birthday in September of 2014. When they renewed their online relationship, it once again included sexual talk, sexual role playing, and mutual masturbation over Skype.

i. In 2015, L.H.'s relationship with her father began to deteriorate. L.H. and Hathaway began to plan for Hathaway to drive to South Carolina, pick up L.H., and bring her back to Illinois. They decided the date to execute their plan would be June 6, 2015.

j. On June 6, 2015, at 1:00 a.m., L.H. cut her bedroom window screen with a knife and met Hathaway outside her house. Hathaway had parked a car belonging to his daughter, ███ down the road from L.H.'s house and helped L.H. carry her luggage to the car. When they reached the North Carolina and South Carolina border, L.H. threw her cellular telephone in a dumpster at a gas station. L.H. was afraid that her cellular telephone could be tracked. On the drive to Hathaway's camper in Missouri, L.H. performed oral sex on Hathaway and he performed masturbation on her.

k. Around 3:30 p.m. on June 6, 2015, Hathaway and L.H. arrived at Hathaway's camper in Troy, Missouri. Here, Hathaway provided alcohol to L.H. Hathaway then had vaginal intercourse, anal sex, and oral sex with L.H. Hathaway and L.H. then waited for ███ to arrive and exchange cars but ███ never came. Hathaway and L.H. drove to the Hathaway family residence in New Canton, Illinois to find ███ Before arriving at the residence, they stopped at a local Walmart and Hathaway bought each of them a prepaid cellular telephone.

l. Once back at the Hathaway residence, L.H. called her grandmother and uncle to inform them of her whereabouts. Police arrived shortly thereafter, and L.H. was taken away and sent to San Francisco to be with her uncle.

40.    The Forensic Medical Exam performed on L.H. at The Keller Center revealed evidence consistent to recent vaginal intercourse, including a laceration of the posterior fourchette. The examiner concluded that the findings were consistent to the historical details provided by L.H. to the nurse practitioner and in her forensic interview.

---

[2] According to the Horry County Police report dated July 3, 2014, L.H. was very defensive of Hathaway and stated that they loved each other and nothing would keep them apart. L.H. told police that their sexual relationship stopped once Hathaway discovered her true age. L.H. also stated that she and Hathaway talk on the phone and exchange emails on a daily basis.

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 16 of 28 PageID #: 86
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 16 of 28
Case: 4:15-mj-07230-SPM   Doc. #: Page ID#:0580/15   Page: 16 of 28 PageID #: 16

41.     While several requests for financial records of Hathaway remain outstanding, certain bank records obtained in the course of the investigation corroborate the timeline as laid out by L.H. in the forensic interview. For instance, records from Hathaway's Hannibal National Bank account reveal two debits to a Best Western in Conway, South Carolina from April of 2014. They also show debits to a Best Western and a Waffle House, both in Conway, South Carolina, and both in July of 2014.

42.     On June 17, 2015, ███████ contacted S.A. Krivanek to inform him that ███████ received text messages from cellular telephone number ███████. Due to the context of the text messages, ███████ believed that the person trying to communicate with him was Hathaway. S.A. Krivanek asked ███████ if he would consent to having a telephone call with ███████ monitored, and he provided his consent.

43.     On June 17, 2015, at approximately 6:24 p.m., ███████ called the number ███████ while S.A. Krivanek monitored the conversation. The person who answered the call confirmed that he was, in fact, Hathaway. In the conversation that ensued, Hathaway stated the following:

a.   He met L.H. when she was 13-years-old. L.H. initially told Hathaway that she was 18-years-old. Hathaway was attracted to her smile and her personality. Hathaway cooked BLT's for L.H. at her house when her dad was not there and spent the night on the couch. Hathaway had come to South Carolina to visit L.H. probably 10 times. Hathaway spent three to four days there each time. Hathaway would stay in a hotel, a pop-up camper, or at L.H.'s house. One time when L.H. and her sister, ███████ were having problems, Hathaway came to South Carolina and stayed at a Super 8 motel for five days without them knowing he was there. Hathaway was afraid one of them would run off. Hathaway would sit on the dirt road by their house every night and wait to see if one of them would run off.

b.   L.H. told Hathaway her real age and asked if Hathaway still had the same feelings for her that he had expressed. Hathaway told L.H. that the feelings don't change or go away. Hathaway stated, "I love [L.H.]." Hathaway was 46-years-old but felt like he was in his 20's when he was around L.H. Hathaway went to counseling and felt sick for two weeks when he found out L.H.'s real age, but he could not hide his feelings for L.H.. Hathaway contacted L.H.'s father to ask him for permission to marry her. L.H.'s father agreed to meet with Hathaway, but when Hathaway went to the father's home, L.H.'s father would not listen to Hathaway. L.H.'s father cursed out Hathaway and Hathaway's son, who had also come on the drive to South Carolina. L.H.'s father then contacted the police.

c.   Hathaway asked ███████ if he ███████ could bring L.H. to Hathaway's property in Troy, Missouri and spend a weekend to talk and see how Hathaway is with L.H. If ███████ was comfortable with the situation, Hathaway would ask him for L.H.'s hand in marriage. Hathaway asked ███████ if he ███████ could

15

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 17 of 28 PageID #: 87
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 17 of 28
Case: 4:15-mj-07230-SPM   Doc. #: Page: 07/30/15   Page: 17 of 28 PageID #: 17

give L.H. a big hug for him and to tell her that he loved her. Hathaway also stated that he had kept some of L.H.'s personal belongings and that it would not be good if the Sheriff found them.

44.   On June 22, 2015, at approximately 11:56 a.m., ███████ contacted Hathaway at ███████ for a second consensually monitored and recorded telephone call. Highlights of that call are as follows:

    a.   ███████ stated, "[L.H.]'s 15 now but when you guys met she was 13," to which Hathaway responded, "Yeah, I know." ███████ asked Hathaway, "When you first met, she told you she was 18, but she didn't lie to you after that and she told you she was 13, is that correct?" Hathaway responded, "Yes, she confessed and I went through a little rough period for about three weeks after that." Hathaway said he and L.H. continued to see each other for almost three years. Hathaway stated he would talk to L.H. on Skype, on the phone, and by email, but that they did not communicate much on Facebook because it is unsecured and could be hacked.

    b.   According to Hathaway, he and L.H. got serious when she was 13-years-old. Hathaway said that he gave L.H. an engagement ring and they read their vows to one another. Hathaway said he wanted to pursue the relationship with everything he had.

    c.   According to Hathaway, he and L.H. first got intimate at her house in June of 2013 when L.H.'s father was away on a trip. L.H. gave Hathaway her virginity in a Super 8 hotel the following day. According to Hathaway, L.H. talked to Hathaway about having babies, and having another child had always been something Hathaway wanted. Hathaway stated that he was very glad for the bad parenting of L.H.'s father, otherwise he never would have met L.H.

45.   On June 23, 2015, with L.H.'s consent, S.A. Krivanek accessed her Facebook[3] profile. According to ███████ due to restrictions ███████ placed on L.H. while she lived with him, L.H. had not accessed Facebook since she came to reside with him on June 7, 2015. S.A. Krivanek accessed a page linked to L.H.'s profile called "Ever Found Love," and there were numerous recent messages from a Facebook user with the profile name "Ralph David Hathaway." Review of the message history led S.A. Krivanek to believe this user was, in fact, Hathaway. The date-and-time-stamped messages from Hathaway included the following:

---

[3] Facebook is a social networking site which allows users to create unique profiles and use those profiles to communicate with other users. Communication can happen through a variety of ways, including, but not limited to, "posts," which can be seen by groups of other users, and "messages" directed at individual users. The latter can only be seen by those included on the message. By default, the communication history of a user is logged and remains associated with that user's account until deleted by the user.

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 18 of 28 PageID #: 88
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 18 of 28
Case: 4:15-mj-07230-SPM   Doc. #: Flag Filed: 07/30/15   Page: 18 of 28 PageID #: 18

    a. "I love you baby and i [sic] want you here with me! You can do everything here you can anywhere else and we get too [sic] be together." (June 19, 10:34 p.m.)

    b. "I love you and need you here baby please come too [sic] me here[.]" (June 21, 6:30 p.m.)

    c. "You said it was just us then make I tthat [sic] way so we can begin our life[.]" (June 22, 7:55 p.m.)

    d. "You are my last love and I want too [sic] be your last baby hold close and stay true[.]" (June 23, 12:26 a.m.)

  46.    It should be noted that, when S.A. Krivanek logged into the account several days later, these messages had been deleted.

  47.    After reviewing the messages, and with L.H.'s consent, S.A. Krivanek assumed her online identity for purposes of messaging Hathaway.  Between 1:29 p.m. and 1:41 p.m. on June 23, 2015, 19 messages were exchanged between Hathaway and S.A. Krivanek, acting as L.H. (15 sent by Hathaway, four sent by me).  This communication included the following:

    a. (From S.A. Krivanek, acting as L.H.): "I love you too!!! I miss you so much but don't have much time. My uncle is only letting me use his computer for a little bit!!" (June 23, 1:31 p.m.)

    b. (From Hathaway): "I know so what you thinking I need you here like we talked about in my arms[.]" (June 23, 1:31 p.m.)

    c. (From Hathaway): "sent you emails and messages too your rocketmail[4] and textnow[5][.]" (June 23, 1:34 p.m.)

    d. (From Hathaway): "I meant every word I have said and every promise I want you with me and too [sic] have children together and many years[.]" (June 23, 1:35 p.m.)

    e. (From Hathaway): "Most of my family wants too [sic] meet you the lady that has my heart and craziness with such a hold not even the law or anything can shake it[.]" (June 23, 1:36 p.m.)

---

[4] Rocketmail is an email service offered by Yahoo! Inc.

[5] TextNow is a software application that allows users to communicate through voice calls, text messages, picture messages, and voicemail using the Internet The application can be downloaded to, and used from, a computer, smartphone, or other electronic device. By default, the TextNow application on a device logs communication history. This history remains associated with that user's profile until deleted by the user.

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 19 of 28 PageID #: 89
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 19 of 28
Case: 4:15-mj-07230-SPM   Doc. #: 6-2   Filed: 06/30/15   Page: 19 of 28 PageID #: 19

48.     It should be noted that, when S.A. Krivanek logged into the account several days later, these messages had been deleted.

49.     On June 23, 2015, with L.H.'s consent, S.A. Krivanek accessed L.H.'s email account,████████@rocketmail.com. This email account had many unread messages in its inbox, including four emails from its own address ████████@rocketmail.com). These emails were all sent between June 20 and 23, 2015. Based on the content of these messages, as well as some of the grammatical errors being consistent with his other writing, S.A. Krivanek believed these messages to be from Hathaway. To accomplish this, Hathaway would have had access to her email account. As referenced below, Hathaway does appear to be familiar with at least two of the passwords L.H. uses in her online communication profiles. The date-and- time-stamped messages included the following:

   a.   "Have you requested too [sic] talk too [sic] me is there anything you want too [sic] know did you ask him too [sic] ask? I love you and meant ever [sic] word we spoke on the car ride..." (June 20, 10:40 a.m.)

   b.   "Hold true too [sic] all we have together, our vows, our promises, and soon we will be man and wife...I love you so much baby and just need you here and we will enroll you in school and start." (June 22, 12:47 p.m.)

   c.   "Use your ████ at text now I am sure you can I sent message too [sic] it and its either your T or H password probably ilove [sic] you and I cant [sic] sleep thinking about you. I fear every day they are coming to lock me up and I don't care I just want you here in my life I am tired of hiding and spending months and years apart...I love you ████ 'Hathaway' my family wants too [sic] meet you very much and I want too [sic] parade you around holding hands 'I Ralph David Hathaway love you ████ and want you and need you too [sic] be my loving wife[.]'" (June 23, 7:40 a.m.)

50.     It should be noted that, when S.A. Krivanek logged into the account several days later, these messages had been deleted.

51.     On June 30, 2015, S.A. Krivanek interviewed Hathaway's wife, ████ Hathaway ████, at her residence at 260 South Mississippi Street, New Canton, Illinois. At the time of the interview, ████ and Hathaway were separated. According to ████, she and Hathaway previously had an open relationship and ████ encouraged Hathaway to drive down and meet L.H. after he met her online. ████ thought that L.H. was 18-years-old. ████ could not go down herself because of her job. ████ and Hathaway once video streamed themselves having sexual intercourse to someone over Skype. ████ acknowledged that person could have been L.H. ████ observed Hathaway keep his laptop next to their bed so he could watch L.H. sleep over Skype. She also caught Hathaway becoming aroused during a Skype session with L.H. and another girl but both girls were dressed. Hathaway told ████ that he knew L.H. is under 18-years-old, but he loves her and he will wait for her to turn 18.

18

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 20 of 28 PageID #: 90
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 20 of 28
Case: 4:15-mj-07230-SPM   Doc. #: Page #00/30/15   Page: 20 of 28 PageID #: 20

52.   On June 30, 2015, S.A. Krivanek interviewed Hathaway, also at the New Canton residence. During the interview, Hathaway stated the following regarding his relationship with L.H.:

a.   Hathaway met L.H. online in 2013. In June of 2013, Hathaway went to Conway, South Carolina for two days to meet L.H. in person. Hathaway believed L.H. was 18-years-old at that time. Hathaway and L.H. started a sexual relationship and Hathaway developed strong feelings for L.H. Hathaway visited L.H. seven to eight times over the course of their relationship. In August of 2013, L.H.'s father went away on a cruise and Hathaway came to visit. Hathaway stayed at L.H.'s house and they had sexual intercourse. Hathaway could not recall the details or time frame of his other visits.

b.   Hathaway gave his email address of hammer.crane@yahoo.com. He did not offer the address of navydavid69@yahoo.com, which is the account through which L.H. stated she communicated with him.

c.   Hathaway did not remember exactly when he found out L.H.'s true age but knew she was only 14 years old when he drove down to Conway, South Carolina to meet her father in 2014. Hathaway had been expecting law enforcement to talk to him for the last two years once he found out her true age.

d.   After picking up L.H. on June 6, 2015, Hathaway and L.H. stopped at his camper in Troy, Missouri before continuing to New Canton, Illinois. Hathaway was asked if he and L.H. had sexual contact in the camper. Hathaway responded, "We had some intimacy, yes."

53.   Subsequent to her arrival in California, L.H. informed FBI personnel of the various modes of communication that she used with Hathaway throughout the course of their relationship. This communication included the following:

a.   Email. L.H. stated that she and Hathaway used email frequently. The email address he used was navydavid69@yahoo.com. She used at least three different email addresses: ▮▮▮▮@rocketmail.com; ▮▮▮▮@rocketmail.com; and ▮▮▮▮@yahoo.com.[6] L.H. gave the FBI access to the account she used most frequently, as referenced in paragraph 23 above.

b.   Skype. L.H. stated that she and Hathaway used Skype regularly. She stated that her Skype account user name as ▮▮▮▮▮" She stated that Hathaway's Skype account username is "navydavid69." Skype records confirm that various

---

[6] In records received in the course of the investigation from Skype, it was discovered that L.H. had yet another email address associated with her Skype account ▮▮▮▮@yahoo.com

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 21 of 28 PageID #: 91
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 21 of 28
Case: 4:15-mj-07230-SPM   Doc. #: PageID#07/30/15   Page: 21 of 28 PageID #: 21

IP addresses associated with the use of █████████████ originated from
Conway, South Carolina. Skype records also confirm that the IP addresses
associated with the use of "navydavid69" originated from New Canton, Illinois,
as well as Herndon, Virginia, which is where Hathaway resided immediately
before moving to New Canton.

   c.   Facebook. L.H. stated that she and Hathaway messaged each other through their
Facebook profiles. She gave the FBI access to her Facebook account, as
referenced in paragraphs 19 through 21 above. The name associated with her
Facebook profile was her true first and last name. The name associated with
Hathaway's profile was "Ralph David Hathaway."

54.     Due to the role that social media and electronic communications played in
facilitating Hathaway's communication with L.H. throughout the course of their relationship,
investigation was undertaken to determine the extent of their activity on these platforms. On
June 10, 2015, S.A. Krivanck requested through the FBI Springfield Field Office a social media
research and analysis on Hathaway and L.H. The results of that research and analysis with regard
to L.H. include the following:

   a.   A Facebook account was identified for L.H. (facebook.com █████████ ID:
█████████████████

   b.   Various other accounts of L.H. on other social media platforms were discovered
(Twitter, Google Plus, Social Cam); these accounts were determined to be used
very infrequently.

55.     The FBI's social media research and analysis with regard to Hathaway, produced
his Facebook profile (facebook.com/Ralph.d.hathaway, ID: 1346027561). Further, a number of
social media accounts were found for the username Navydavid69, a known username used by
Hathaway.[7] These accounts include the following:

   a.   Chaturbate.com. This adult website allows users to view other individuals real
time through an internet web camera. Navydavid69 has a profile on this site
(cahturbate.com/navydavid69). This profile lists the user's birthdate as 10/27/75
(Hathaway's birthdate is █████████)

   b.   Mydailyflog.com. This website allows users to post personal videos and photos
and share them with their other users. Navydavid69 has a profile on this site

---

[7] This user name was discovered by the FBI as a user name associated with Ralph David Hathaway
independent from any information from L.H. In other words, the social media research and analysis
determined this to be a user name frequently used by Hathaway, and later, L.H. confirmed that this is the
name he uses for is Skype account as well as his email address.

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 22 of 28 PageID #: 92
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 22 of 28
Case: 4:15-mj-07230-SPM   Doc. #: Page 6/07/30/15   Page: 22 of 28 PageID #: 22

(mydailyflog.com/navydavid69). The profile lists the user as residing in Virginia, which is where Hathaway resided before moving to Illinois. Online reviews indicate this site is a used largely for pornography.

c. Dating websites. Navydavid69 has a profile at least three dating websites, all of which have names indicating that they cater to customers looking for someone outside of their age range. These sites include YoungerWomenWithOlderMen.com; agpmatch.com (age gap match); and CougarLove.com. These sites are hosted by the same parent company, Successful Match.

56.     The FBI's social media research and analysis also analyzed the use of the website Magic 8 Ball (m8ball.com) by two anonymous users. Through this site, users type a question into a query box, and the site generates a generic answer, such as "Count on it," "Most likely," "NO!" and "Not in a million years." Each user is assigned a unique "anonymous number" based on the IP address of the user. Two different users, believed to be Hathaway and his wife ▮▮▮▮ entered numerous questions regarding L.H. These messages are not time or date stamped. Anonymous user 397266, believed to be Hathaway, posted the following questions:

a. "Will [L.H.][8] care if I go to jail nor not?"

b. "Will [L.H.] be by why I go to jail?"

c. "Will [L.H.] have my children?"

d. "Has [L.H.] cheated on me?"

e. "Will [L.H.] cheat on me?"

f. "Will [L.H.] wait for me?"

57.     Anonymous user 1026593, believed to be ▮▮▮▮ Hathaway, posted the following questions:

a. "Will I hurt [L.H.]?"[9]

b. "Will God bring us back together?"

---

[8] In all examples where Anonymous user 397266 references L.H. in a question, the name that is actually typed into the query box is L.H.'s true first, middle, and last name.

[9] In all examples where Anonymous user 1026593 references L.H. in a question, the name that is actually typed into the query box is L.H.'s true first, middle, and last name.

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 23 of 28 PageID #: 93

Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 23 of 28
Case: 4:15-mj-07230-SPM   Doc. #: Filed: 07/30/15   Page: 23 of 28 PageID #: 23

   c.   "Is Ralph David still lying to me?"

   d.   "Can I trust Ralph David Hathaway?"

   e.   "Will Ralph David Hathaway put our marriage back on track this year?"

   f.   "Will [L.H.] stop seeing my husband?"

   g.   "Will [L.H.] come here to IL this year?"

58.     As described above and in Attachment B, this application seeks permission to search for records that might be found on the PREMISES, in whatever form they are found. One form in which the records might be found is data stored on a computer's hard drive or other storage media. Thus, the warrant applied for would authorize the seizure notes, diaries and of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

## CONCLUSION

59.     I submit that this affidavit supports probable cause for a warrant to search the PREMISES described in Attachment A and seize the items described in Attachment B.

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 24 of 28 PageID #: 94
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 24 of 28
Case: 4:15-mj-07230-SPM   Doc. #: Page 5d #07/30/15   Page: 24 of 28 PageID #: 24

## ATTACHMENT A

*Property to be searched*

The property to be searched is a 2006 white dual axle travel trailer, aluminum siding, Illinois license plate 603859RT, VIN: 1NL1GTR2461041590, presently located at 174 Cabin River Road, Troy, Missouri, in the Eastern District of Missouri, and is depicted below.



Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 25 of 28 PageID #: 95
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 25 of 28
Case: 4:15-mj-07230-SPM   Doc. #: Filed: 07/30/15   Page: 25 of 28 PageID #: 25

## ATTACHMENT B

*Property to be seized*

1.    All records relating to violations of 18 United States Code §§ 2251, 2252, 2252A, and 2423(a), which criminalize, among other things, the production, possession and/or receipt and shipment of child pornography, and other related materials; and the transportation of a minor with the intent to engage in criminal sexual activity, those violations involving Ralph David Hathaway and occurring after June 1, 2013, including:

    a.  Records and information relating to the e-mail accounts hammer.crane@yahoo.com and navydavid69@yahoo.com;

    b.  Records and information relating to the Skype accounts navydavid69;

    c.  Records and information relating to the Facebook account facebook.com/Ralph.d.hathaway, ID: 1346027561;

    d.  Records and information relating to the use of the online dating sites such as YoungerWomenWithOlderMen.com; agpmatch.com; and CougarLove.com;

    e.  Records and information relating to anticipated travel to South Carolina;

    f.  Records and information related to stored photographs of L.H.;

    g.  Records and information relating to malicious software.

Case: 4:15-mj-07230-SPM   Doc. #: 8   Filed: 02/16/16   Page: 26 of 28 PageID #: 96
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16   Page: 26 of 28
Case: 4:15-mj-07230-SPM   Doc. #: Page: 07/30/15   Page: 26 of 28 PageID #: 26

2.      For any computer, cellular telephone, or storage medium whose seizure is otherwise authorized by this warrant, and any computer or storage medium that contains or in which is stored records or information that is otherwise called for by this warrant (hereinafter, "COMPUTER"):

a.   evidence of who used, owned, or controlled the COMPUTER at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

b.   evidence of software that would allow others to control the COMPUTER, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the lack of such malicious software;

d.   evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

e.   evidence indicating the computer user's state of mind as it relates to the crime under investigation;

2

Case: 4:15-mj-07230-SPM   Doc. #: 8 · Filed: 02/16/16   Page: 27 of 28 PageID #: 97
Case: 4:15-mj-07230-SPM   Doc. #: 6-2 *SEALED*   Filed: 02/12/16 · Page: 27 of 28
Case: 4:15-mj-07230-SPM   Doc. #: 1   Filed: 07/30/15   Page: 27 of 28 PageID #: 27

f.   evidence of the attachment to the COMPUTER of other storage devices or similar

containers for electronic evidence;

g.   evidence of counter-forensic programs (and associated data) that are designed to

eliminate data from the COMPUTER;

h.   evidence of the times the COMPUTER was used;

i.   passwords, encryption keys, and other access devices that may be necessary to

access the COMPUTER;

j.   documentation and manuals that may be necessary to access the COMPUTER or

to conduct a forensic examination of the COMPUTER;

k.   records of or information about Internet Protocol addresses used by the

COMPUTER;

l.   records of or information about the COMPUTER's Internet activity, including

firewall logs, caches, browser history and cookies, "bookmarked" or "favorite"

web pages, search terms that the user entered into any Internet search engine, and

records of user-typed web addresses;

m.   contextual information necessary to understand the evidence described in this

attachment.

3.   Routers, modems, and network equipment used to connect computers to the

Internet.

3

Case: 4:15-mj-07230-SPM   Doc. #:  8   Filed: 02/16/16   Page: 28 of 28 PageID #: 98
Case: 4:15-mj-07230-SPM   Doc. #:  6-2 *SEALED*   Filed: 02/12/16   Page: 28 of 28 PageID #: 73
Case: 4:15-mj-07230-SPM   Doc. #:  1-1   Filed: 07/30/15   Page: 28 of 28 PageID #: 28

4.      Any diaries, journals, notes, or records, whether in written, printed, or in

electronic form, and that appear to be written by L.H.